[No. 1885.]

SARAH JOHNSON *v.* THE STATE.

1. PRACTICE — EVIDENCE. — An expert chemist being introduced by the State as a witness on a trial for murder by poison, was permitted to testify to the result of his examination of the contents of a human stomach which was delivered to him for chemical analysis. The objection urged by the defense was that, when the witness was introduced to testify, no evidence had been produced to identify the stomach analyzed by the witness as the stomach of the deceased. The State, however, when it offered the witness, announced that, by a witness who was not then in the court-house, it would establish the identity of the stomach and contents analyzed by the witness as the stomach of the deceased, and it did subsequently establish the fact, and that the said stomach and contents passed into the hands of the chemist in the condition in which they were taken from the body. *Held,* that the evidence was properly admitted.

2. SAME. — It was not error to permit a State witness to testify that while the coroner's inquest over the body of the deceased was in progress the defend-

ant, in answer to the question if she did not poison the deceased, said: "I don't give a d—n if I did." The objection that the defendant was then under arrest and in duress is disproved by the record, and no valid objection to the proof is apparent.

8. Murder — Fact Case.— See the statement of the case for evidence *held* sufficient to support a conviction for murder in the first degree.

Appeal from the District Court of Bexar. Tried below before the Hon. G. H. Noonan.

Upon an indictment which charged her with the murder by poison of Alfred Owens, in Bexar county, Texas, on the 22d day of June, 1885, the appellant was convicted of murder in the first degree, and was awarded a life term in the penitentiary.

Doctor Lowery was the first witness for the State. He testified that he was called to see the deceased professionally on June 22, 1885, and arrived a few minutes before his death. When he arrived he found the deceased in a state of collapse and in a dying condition. He was suffering with cramps, vomiting and purging. His symptoms were those of arsenical poisoning. Witness prescribed for the deceased and for a little girl who was sick at the same time. The prescriptions written by witness were introduced and identified. The defendant, the deceased's wife, and some small children were present when the witness arrived. On his cross-examination the witness stated that the symptoms of the deceased were such as attended cholera and cholera morbus as well as arsenical poisoning. Witness made no *post-mortem* examination of the body of the deceased.

George H. Kalteyer was the second witness for the State. He testified that for sixteen years past he had been by profession a druggist and chemist. On the 22d day of June, 1885, he was applied to by Justice Neuendorf to make a chemical analysis of the contents of the stomach of Alfred Owens, deceased. He accordingly made arrangements to do so, provided the glass jar for the transfer of the stomach to his laboratory, and received the jar containing a stomach, said to be that of Alfred Owens, on the night of June 22, 1885. The jar, with the stomach tied at both ends, was brought to witness's place of business about 9 o'clock on the night of June 22, by Deputy Sheriff Krempkan. Witness opened the stomach the same night in the presence of Doctor Brannagel, who recognized it as the stomach of the deceased. He then locked the stomach in his laboratory, to which no one but himself had access. On the next day, June 23, witness analyzed the contents of the stomach. He found

it about one-fourth filled with a liquid substance. Witness found in the stomach eighteen and four-tenths grains of white arsenic, which was a sufficient amount, independent of what had been absorbed by the tissues of the spleen, stomach, liver and general circulation, to kill a half dozen people. It is the poison thus absorbed that produces death. Arsenical poisoning is symptomized by vomiting, purging, cramp and constant thirst. On the following day Deputy Sheriff Krempkan brought to the witness at his laboratory an oblong dish, a round plate and a cup and saucer. There was grease but no arsenic on the oblong dish. On the round plate the witness found some grease and some crystals of white arsenic. The witness identified the round plate in evidence, and pointed out the crystals of arsenic. He also produced the eighteen and four-tenths grains of arsenic taken by him from the stomach which he analyzed.

Cross-examined, the witness stated that he was not present at the post-mortem examination. He could not say of his own knowledge that the stomach analyzed by him was the stomach of Alfred Owens, but it was given to him as the stomach of the said Owens, and was identified as Owens's stomach by Doctor Brannagel. Witness did not know who owned the dish, plate and cup and saucer delivered to him by Krempkan, nor from whose possession they passed into Krempkan's hands.

August Krawitz was the next witness for the State. He testified that he was a member of the jury of inquest which sat upon the body of Alfred Owens, and suggested to Justice of the Peace Neuendorf the propriety of a post-mortem examination. Witness was present and saw Doctor Brannagel open the body, and helped him to remove the stomach and place it in a glass jar. Witness then, in company with Henry Krempkan, took the glass jar containing the stomach, and drove in a buggy to the drug store of George Kalteyer. Krempkan took the jar containing the stomach from the buggy into the drug store, and delivered the same to George Kalteyer. No one tampered with the stomach from the time it was removed from the body until it was delivered to Kalteyer. Witness found a dish and plate on the table in the kitchen of the deceased's house, and as he looked upon their contents with suspicion, he took them to Kalteyer on the 23d day of June. The stomach, just as it was taken from the body, except being tied at both ends, was delivered to Kalteyer between 8 and 9 o'clock on the night of June 22, 1885.

George Smith testified that he was a clerk in the drug store of George Kalteyer, in San Antonio, Texas, and was so employed in June, 1885. On the evening of June 21, 1885, the evening prior to

the death of Alfred Owens, the defendant came to Kalteyer's drug store and asked for " rough on rats." As that poison sold for fifteen cents per package, and as the defendant had but ten cents, the witness advised her to take arsenic, which would as effectually exterminate rats. Witness sold her three or four ounces of white arsenic, and told her to mix it with corn meal in saucers, and place the saucers within the reach of the vermin. He cautioned her to be very careful, as the arsenic was a deadly poison. Witness gave her the arsenic in a package labeled " poison," and on which was the caricature of a skull and cross-bones, and wrote plainly across the package the word " arsenic." Defendant did not tell witness that any one sent her for the poison, and witness entered her name on the poison book as the person to whom the poison was sold.

Johnny Johnson was the next witness for the State. He testified that he resided in San Antonio, Texas, was eighteen years old, and in June, 1885, was employed at the " White Elephant." He was acquainted with, but was not related to, the defendant. Alfred Owens, the step-father of the defendant, died in San Antonio on Monday, June 22, 1885. Witness saw the defendant on Sunday morning; and on Saturday night preceding the death of Owens, witness saw the defendant at the colored skating rink, and escorted her home about 2 o'clock on that night. Witness could not recall all that was said by himself and defendant on the way to the defendant's home from the skating rink. Defendant, however, said that her step-father, the deceased, habitually mistreated her, refusing to permit her to go out, and that she had determined to poison him with rat poison. Witness advised her not to talk in that manner, as she certainly did not mean what she said. Defendant replied: " You don't believe me, but you will see, and if you don't quit going with those other girls I will fix you too." On the second Saturday prior to the Saturday night on which this conversation took place, the defendant talked to witness in a like strain about the deceased. She stated in plain terms that she was going to kill her step-father, " fix " the witness, and kill herself. Witness saw and talked with the defendant a short while between 9 and 10 o'clock on the morning of June 22, 1885. She then had two prescriptions in her hand, and said that she was going after medicine for her step-father, who was sick with the cholera. This was at the " White Elephant." She left and shortly returned, when witness asked her what was the matter with her step-father. She replied: " I did not poison him." She left, and returned later, when she said that her step-father was dead, and asked witness for a dollar to buy shoes to wear to the funeral. Witness, not having the money

then, told her he would bring it to her that night.    He went to her
house that night, but did not see her.    Witness attached no impor-
tance to the defendant's threats to kill her step-father with "rough
on rats."    Defendant, when her home was reached on Saturday
night preceding the death of her step-father, said that she did not
want to enter the house, as she was afraid the deceased would whip
her.    On the first day of the proceedings in the justice's court, and
before the witness had testified before that tribunal, he asked the
defendant if she did not kill her step-father.    She replied: "I don't
give a d—n if I did."    The justice's court-room was then crowded.

Cross-examined, the witness stated that the defendant first threat-
ened, in his presence, the use of "rough on rats," near the colored
church, and about a week before the death of Owens.    Witness
could not say whether it was on her first or second call at the
"White Elephant," on the fatal Monday, that she volunteered the
statement that she did not poison the deceased.    It was on the first
day of the proceedings in the justice's court that defendant, in
answer to witness's question if she did not kill her step-father, an-
swered: "I don't give a d—n if I did."    Defendant testified before
that tribunal on that day.

H. Luhting, druggist, testified for the State that he filled the two
prescriptions in evidence which were signed by Doctor Lowery.
No arsenic or other poison entered into the compound of either.

Eliza Johnson, the next witness for the State, testified that she
and the defendant were sisters, and were step-daughters of the de-
ceased, Alfred Owens.    The defendant, witness, her sister Charlotte,
her mother and the deceased were at home together on the night of
Sunday, being the night preceding the death of Owens.    Defendant
and his wife, who went to the springs on that evening, got back
about sundown.    Some time afterwards deceased's wife went to
bed, and deceased went to visit the witness's Aunt Lilly.    Defendant
then, in the presence of witness, took some meat, and with a spoon
spread a white substance over it, pressing the white substance into
it with the spoon.    Defendant gave witness a small piece of meat
before witness went to bed, telling witness, in reply to her inquiry,
that the white, foaming substance on the meat was produced by the
fat.    Deceased ate of the meat at breakfast on the following (Mon-
day) morning, and went off to his work.    He afterwards returned
home.    After deceased and his wife went to the springs, and while
they were gone, defendant left the house, saying that she was going
to get a watermelon.    She came back empty-handed so far as the
witness knew, and said that she failed to get a melon.    Witness saw

her put the white substance on the meat, but knew nothing about where or how she procured it. Witness was sick on the morning after she ate of the meat. She vomited a great deal and had cramps in the stomach. She heard the deceased say that he was sick, but did not know how he was affected.

Cross-examined, the witness stated that she was in bed and did not know when the deceased came back from her Aunt Lilly's on the night before his death. The substance on the meat tasted sweet to the witness. Witness slept all night after eating the meat, which was but a very small piece, and she was not sick until next morning. The piece eaten by the witness was a fragment of the meat which had the white substance on it. Deceased died on the day after the witness ate the meat. The meat was put in a round plate similar to the plate in evidence.

Annie Owens, the wife of the deceased and the mother of the defendant, testified for the State that she and her husband went to the San Pedro springs on the evening before the death of the deceased, and returned home shortly after dark, or about 8 o'clock. She left defendant and her children at the house. Very soon after her return, the witness ate a small piece of meat and some roasting ears, and went to sleep. She did not know when the deceased, who on his return from the springs went to the house of his brother, near by, came back. The witness cooked the meat on Sunday, and she, deceased, defendant and the remaining two children ate of it at dinner on that day. When she started to the springs, after dinner, witness put the remnant of the meat in the stove for the deceased's supper. On her return from the springs, and after eating a small piece of the meat, the witness put the remainder on a plate on the table so that the deceased, if hungry, could find it on his return. When the deceased got up the next morning he said that he felt unwell and would not go to his place of work if he could get his brother to go in his stead. His brother could not go, and the deceased went. He returned after about one hour, complaining of feeling very unwell. He vomited before he got into the house. Witness then sent for Doctor Lowery, who prescribed for deceased. She then sent defendant to Mrs. Haneisen for the money to pay for the medicine, and then sent her father-in-law, Columbus Christopher, to get the prescriptions filled. Deceased, though vomiting and purging violently, did not complain of severe pains before the doctor arrived. He went to the water-closet in the yard before the doctor's arrival, where he was seized with vomiting and purging, and was assisted into the house by his mother and the wit-

ness. The medicine prescribed for the deceased, of which he took but one dose, was a liquid. The doctor prescribed powders for the girl Eliza, who was also sick. But little meat was left on the bone from dinner, and it was placed by witness on the table accessible to deceased for his supper, but she was asleep when deceased returned from his brother's, and did not see him eat of it.

The defendant, who was the witness's first child, was born about five years after emancipation. The witness had reproached the deceased about his relations with another woman. Witness had heard of his improper relations with the woman, and had been told that he had a child by her, but she had never seen the deceased in bed with the woman. Witness could not be positive whether it was Columbus Christopher or the defendant who took the prescriptions to the drug store. Deceased said that the meat tasted like it had peppermint on it,— that something was the matter with it, and to throw it away. Witness did so, and saw her dog eat it. She afterwards saw vomit near the gate, but did not see the dog throw it up. Defendant did not come home on the Saturday night preceding the death of Owens until between 2 and 3 o'clock. About 1 o'clock on that night deceased went to the place where witness had put the defendant at work, to look for her, and found that she had not been at work for a week. When she got into the house on Saturday night, or more properly Sunday morning, witness told her that she intended to whip her soundly on Monday. Witness identified the plate, dish, cup and saucer, in evidence.

Henry Krampkan was the next witness for the State. He testified that he was a deputy sheriff of Bexar county, Texas, in June, 1885. Witness was present at the *post-mortem* examination of the body of Alfred Owens, and saw the stomach taken from the body. The stomach was placed in a glass jar, and then, by witness and Krawitz, was taken to Kalteyer's drug store, and by the witness in person was placed in the hands of George Kalteyer, in exactly the same condition in which it was taken from Owens's body. The plate, dish, cup and saucer in evidence were found in Owens's house, and were taken to Kalteyer on the day following the delivery to Kalteyer of the stomach. The defendant told witness that the package containing the residue of the poison could be obtained from the privy, if it had not sunk. Search failed to discover it. The coroner's inquest was held on 22d, 23d, 24th and 25th days of June, 1885. Johnny Johnson was a witness at the inquest. Defendant was not arrested until after Johnson had testified before the coroner's inquest. It was the impression of the witness that defendant was

arrested on June 24th, after all the witnesses had testified. Defendant went to the house of the witness's mother on the night of the first day of the inquest, saying that she was afraid to go elsewhere. She went but was not taken to the inquest on the 23d day of June.

Matilda Miller testified, for the State, that she saw the defendant at her (witness's) house on Sunday evening before Owens's death. She had a parcel marked "arsenic" in her hand, and said that she was going to use it to kill rats. She came to witness's house again on the next morning, said that she wanted to occupy the water-closet a few minutes, and went to it. She also told the witness that deceased and the girl Eliza were then very sick with the cholera morbus. Witness saw nothing of the package marked "arsenic" on that morning, either in the hands of the defendant or in the water-closet. About 3 o'clock on the same day, defendant told witness that Owens was dead, and in the same connection, without question or suggestion from witness, volunteered the statement that she did not poison him. At the same time she said that she got the poison for a Mexican woman who had gone to the country. Witness asked her who the Mexican woman was. She said that she did not know, but could prove her statement by two white children. Julia Douglass was at witness's house when defendant came there with the arsenic on Sunday evening.

Cross-examined, the witness declared that she could read print, and read the word "arsenic" on the parcel brought to her house by defendant on Sunday evening. Being tested as to her ability to read print, witness failed to read a word on the title page of a volume of the Court of Appeals Reports.

Julia Douglass, the sister of the witness Matilda Miller, corroborated the latter's testimony in every particular, and added that to questions as to the particulars of Owens's death, propounded by witness on Monday evening, defendant said: "You bother me; don't ask so many questions."

Philip Monier testified, for the State, that his and Owens's yards joined. A cat and two of witness's chickens died and swelled up, about the time Owens died. The cat went crazy before death. No *post-mortem* examination of either the cat or chickens was made.

Mary Jane Meyer testified, for the State, that she met the defendant about 2 o'clock on the day of Owens's death. Without question or suggestion, defendant said: "I did not poison my father, for I thought too much of him." She had not then been accused, so far as witness knew. Matilda Miller remarked to witness, in defendant's presence, that she saw defendant with poison on the day before.

The defendant replied that she procured that poison for a Mexican woman, which fact she could prove by two white children. The State closed.

Columbus Christopher, the first witness for the defense, testified that he took the prescriptions to the drug store and had them filled for the deceased, just before his death. Witness got the prescriptions from the defendant at the corner of Houston and Flores streets. Defendant did not go to the drug store.

Doctor Kalteyer, for the defense, testified that arsenic was a white powder with no taste but a faint sweet metallic flavor. Arsenic spread upon meat would not dissolve and become absorbed; it would not foam or bubble, but would cover the meat like so much sand.

Mary Christopher testified, for the defense, that the deceased was her son. About one hour before his death, witness arrived at his house, having been sent for by his wife, Annie Owens. Annie told witness that Alfred was very sick and was in the water-closet, from where she was unable to get him back into the house. Witness went to the closet, helped deceased to his door, where Annie joined her and helped her get him into the house and to bed. The doctor was then sent for, and witness's husband dispatched for the medicine. After Alfred's death Sarah Miller said to defendant: "You poisoned Alfred!" Defendant threw up her hands and replied: "Don't bother me; I got the poison for a Mexican woman." Witness asked her who the Mexican woman was. She said: "She has gone to the ranche. You ask me too many questions; don't bother me." Deceased and his wife did not get along well. They frequently quarreled. Deceased often told witness that he could not get along with Annie and would have to quit her. Deceased treated defendant well, and got along well with her, but often said that she was an incorrigible liar.

Annie Owens, testifying for the defense, said that when the deceased complained of the meat she smelled it, but could detect no odor. Deceased said that it tasted of peppermint, but that it may have been traversed by a centipede. Witness did not hire Uncle Joe Muncey to make her a voudoo bag, nor did she ever attempt to bribe him to voudoo any one.

Charlotte Hightower testified that she had a child by deceased. She asked Doctor Lowery if Alfred had been " voudooed."

The motion for new trial raised the questions discussed in the opinion.

*L. F. Price*, for the appellant.

*J. H. Burts*, Assistant Attorney-General, for the State.

HURT, JUDGE.    This appeal is from the judgment of the district court of Bexar county, convicting appellant for murder in the first degree, the punishment fixed by the verdict being confinement in the penitentiary for life.    The deceased was the step-father of the accused, and the homicide was effected by the use of poison,—arsenic.

It is urged that the court below erred in allowing the State's witness Kalteyer, an expert chemist, to testify, over objection, as to the result of his examination of the contents of a stomach which had been submitted to him for analysis, the objection being that, at the time the evidence was offered and admitted, no proof had been made that the stomach examined by the chemist was in fact the stomach of the deceased, Alfred Owens; and that such evidence at that stage of the proceeding was calculated to prejudice the cause of defendant in the minds of the jury.

It appears from the explanation annexed to the bill of exceptions by the trial judge, that when the objection was made the State's counsel announced that he would show afterwards, by a witness then absent, that the stomach and contents were those of the deceased; and that the evidence was then admitted with the understanding that such evidence as to identity would be produced.    It further very clearly appears from the evidence found in the statement of facts that the stomach and contents examined by Kalteyer were those taken from the body of the deceased, and that it passed into his hands in the condition in which it was taken from the body. This being so, there is no error apparent, and we regard the ruling above criticism.

A like objection was urged to proof of the result of the analysis made of a substance found upon the surface of a plate, a dish, and a cup and saucer, before proof was made to identify possession and custody of them.    This proof was afterwards clearly made, and the remarks above are applicable to the ruling upon this point.

The State was permitted, over objection, to prove that while the inquest was being held by the justice, the State's witness Johnson approached defendant, who was in attendance, and asked her if she did not poison deceased, and that she replied, "I don't give a d—n if I did."    It is urged that this was error, as the defendant was under arrest at the time.    This objection is not sustained by the

record.   The evidence clearly shows that when the question was asked and answered the defendant had not been arrested nor was she under restraint.   At the time, the inquisition seems to have been directed towards the wife of the deceased, and defendant was in attendance as a witness; and it was afterwards that suspicion was directed to the defendant and her arrest made.

The record has had our most careful consideration, and we have found no error.   The evidence of the defendant's guilt is conclusive and the charge of the court is without fault.

The judgment is affirmed.

*Affirmed.*